**Tommy E. HARRIS, Individually and all others similarly situated, Plaintiff,**

v.

**SOUTHERN RAILWAY COMPANY, a Corporation, Defendant.**

No. C–C–85–71–P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

April 23, 1986.
As Amended May 23, 1986.

Michael A. Sheely, Charlotte, N.C., for plaintiff.

M. Daniel McGinn, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, N.C., William P. Stallsmith, Jr., Norfolk Southern Corp., Norfolk, Va., Jeffrey S. Berlin, Verner, Liipfert, Bernhard & McPherson, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

THIS MATTER came on to be heard and was heard before the undersigned without a jury at Charlotte, North Carolina on March 20, 1986.

The Plaintiff was represented by Michael A. Sheely, Attorney at Law. The Defendant was represented by M. Daniel McGinn, Attorney at Law.

The Court will summarize the Plaintiff's evidence before proceeding to making Findings of Fact.

The Plaintiff testified that the incident which resulted in his discharge began on February 8, 1984 at about 10:30 a.m. when T.R. Pitman, a white machinist working at the same facility as the Plaintiff, brought a saw to the Plaintiff's workplace to be cleaned. The Plaintiff further testified that he told Pitman he would clean the saw

when he finished what he was doing, and that 5 to 10 minutes after Pitman left L.J. Beck (Plaintiff's supervisor) came out and wanted to know what was the trouble. The Plaintiff testified that when he responded, Beck said that he didn't want to hear what he had to say. Plaintiff further testified that Beck did not call him "chap" and that he only talked with Beck for two minutes.

The Plaintiff further testified that when Pitman came back for the saw that Pitman told the Plaintiff that he killed people like him in Viet Nam. Plaintiff further testified that Pitman stayed there about 20 minutes arguing, i.e., until about 11:40 a.m. Plaintiff further testified that he told Pitman he would settle it any way he wanted to, and that when he saw Pitman at lunch time he told Pitman that if he thought he could kill him to come on and do it. The Plaintiff testified that Dexter Roberts, a white supervisor, came out and told the Plaintiff to back off. The Plaintiff says he told Roberts about Pitman's threats against him.

The Plaintiff further testified that Carl B. Loflin, the shop superintendent, came over and told the Plaintiff that he wasn't going to have any argument on the company property and to shut up right now. The Plaintiff further testified he had no other contact with Pitman.

The Plaintiff testified that Ted Keightley was present when Pitman threatened the Plaintiff's life, and that Gary Ritchie was present all the time that Beck was there.

The Plaintiff testified that he was upset, and that Roberts had told him to be quiet once or twice. The Plaintiff further testified that he never said anything to Loflin which would be considered disrespectful.

Lewis Mungo, Plaintiff's first cousin and Plaintiff's witness, testified that he knew Pitman and saw him about 12:00 noon on February 8, 1984 when he was at lunch with the Plaintiff. Harris testified that he told Pitman that if Pitman thought he could kill him to come and do it—that Pitman didn't say anything, that Pitman turned to wait for Dexter Roberts, the

project supervisor, to come. Mungo further testified that he and the Plaintiff normally met at the Coke machine and ate lunch at 12:00 noon in the carmen's area, that the Plaintiff explained to Mungo his argument with Pitman, that Pitman came over about that time and started arguing with the Plaintiff, that the shop superintendent, Carl Loflin, was walking by at that time and joined in the conversation; that Loflin said he was not going to be having an argument, and for the Plaintiff to leave the area; that Plaintiff responded that he ate lunch there everyday, that the Plaintiff told Loflin that Pitman had threatened him; that Loflin took Pitman's side and didn't say anything to Pitman, but told the Plaintiff to leave; that after Loflin told the Plaintiff to leave, the Plaintiff just stayed there to eat his lunch and told Loflin to go on in a quiet tone; that he, the Plaintiff, would handle it; and that Plaintiff gave Loflin respect.

## FINDINGS OF FACT

(1) Plaintiff is a black male, 33 years of age.

(2) Defendant employer is a corporation employing more than 15 persons.

(3) Plaintiff was employed by the Defendant from May 17, 1976 until his discharge on February 10, 1984.

(4) Plaintiff was last employed at the Defendant's roadway shop on Liddell Street in Charlotte, North Carolina as a laborer in the cleaning pit, where he cleaned tools.

(5) Plaintiff was a member of the International Brotherhood of Firemen and Oilers.

(6) He began his cleaning job on April 17, 1978, when he replaced a white employee, Ellis, and remained in his job until he was discharged in February of 1984.

(7) L.J. Beck (white) was Plaintiff's immediate supervisor and Carl B. Loflin was the shop superintendent.

(8) Pitman had been a Southern Railway employee for ten to twelve years prior to

February 8, 1984, and had never been disciplined according to the testimony of Carl B. Loflin, the shop superintendent in February 1984, who was retired at the time of the trial. During his job as superintendent from 1979 he had never terminated an employee before Harris, who had worked under Loflin's supervision since 1976. Loflin further testified that he had had many problems with Plaintiff Harris.

In 1982 Harris had been orally reprimanded for being late, for absenteeism, and for being away from his job and not marking his time card.

In 1983 Harris had again been reprimanded for absenteeism and for not marking his time card.

(9) On the morning of February 8, 1984 Pitman, a white machinist, brought a saw to the Plaintiff's work station to be cleaned. The Plaintiff was not present at his work station at that time.

(10) The saw was needed as soon as possible because the track supervisor had an emergency as a result of a wreck on the mainline.

(11) Pitman had been told by his supervisor to take the saw to be cleaned as soon as possible.

(12) After "a good amount of time," Pitman went back to Harris to get the saw. Harris said, "What do you want?" and "You and every other son of a bitch wants something done."

(13) Pitman then went to L.J. Beck, the supervisor of both Harris and Pitman, and told him he was having difficulty having the saw cleaned. Beck went to Harris and told him that he had to have the saw. Harris responded that someone else had been there earlier bitching about the saw, and yelled out: "I don't need you to tell me anything. I'm no chap—you better get back in the shop." Gary Ritchie was present, and corroborated this testimony.

(14) When Pitman returned to Plaintiff to pick up the saw, Plaintiff told him that no s.o.b. goes to the boss man, and that he was going to whip Pitman's ass. He told Pitman to meet him in the parking lot, but

Pitman told the Plaintiff that it was not worth losing their jobs over a fight like this. Pitman reported this incident to Mr. K.D. Roberts, the shop supervisor. He told Roberts that he did not want to lose his job but that he would defend himself if necessary. Pitman's statement to Roberts was corroborated by Roberts. This was corroborated by Ted Keightley, who added that the Plaintiff told Pitman "I'll stomp your tail. You meet me in the parking lot." Keightley testified that Pitman replied: "You won't get any virgin if you do." Keightley further testified that Pitman never made any threat to Harris to kill him.

(15) The Plaintiff went to Pitman's work area at noon, lunch time, and was hollering for Pitman to go outside and fight. Roberts testified that he heard Harris yell "Hey." Roberts immediately went over in Harris' direction because of what Pitman had reported to him. Pitman had turned his back on Harris. He yelled at Roberts that he had better get Harris out of there. Roberts positioned himself between Harris and Pitman and told Harris to "back off." Carl Loflin, shop superintendent, heard the loud remarks by the Plaintiff and went over to the scene. Loflin told the Plaintiff there would be no fighting on company property. He had to ask the Plaintiff to calm down three or four times. As Loflin and Roberts turned to leave, Harris told Loflin in a boisterous and disrespectful manner in the presence of several non-supervisory employees that Loflin could leave and that they did not need him there anymore. Loflin responded to Plaintiff, "You don't tell me when to leave."

(16) The Plaintiff had been counseled several times by L.J. Beck, project supervisor, about coming in late, taking long lunches, and coming back from lunch and punching in and then "getting lost." Beck testified further that Harris was worse than other employees with respect to absenteeism and that Pitman had been one of the best employees under his supervision.

(17) After lunch, Loflin called several supervisors into his office to find out the

background of the incident between Harris and Pitman. He scheduled a preliminary investigation of Harris pursuant to the union rules for the next day since it appeared to him that Harris had threatened Pitman with bodily harm and had been insubordinate to Beck and himself. J.P. Henderson, the Plaintiff's chosen union representative, telephoned Loflin and requested that the investigation be postponed until the following week so that he could be present to represent the Plaintiff. Loflin told Henderson that he needed to proceed with the investigation but that he would postpone it until February 10 at 2:00 p.m. Loflin noted that Rule 34(b) of the Union Contract provided that an employee may be accompanied by his union representative "provided he is *readily available.*" Defendant's Ex. 8, p. 38. Loflin determined that Henderson was not "readily available," and proceeded with the preliminary investigation at 2:00 on February 10.

(18) The Plaintiff did not show up at the designated time and place for the investigation. Loflin sent Roberts to get Harris; however, Harris refused to go to the investigation without his union representative. Therefore, Loflin and Roberts went to the Plaintiff's work station to conduct the investigation. Loflin informed the Plaintiff that another union representative was readily available, and that he could be brought to the Plaintiff's work station to represent him if the Plaintiff so desired. The Plaintiff responded that he wanted no other union representative.

(19) Loflin told the Plaintiff the charges against him were that the Plaintiff had been insubordinate to his superiors and had threatened bodily harm to an employee. Plaintiff was given an opportunity to respond, but when he did not after several minutes, Loflin told the Plaintiff that he was discharged and to get his personal belongings and "hit the clock." Loflin confirmed the discharge with a letter dated February 10, 1984.

(20) On February 16, 1984, Plaintiff came to Loflin's office, handed him an envelope, said nothing, and walked out. The envelope contained a letter requesting a preliminary investigation. Loflin wrote Harris a letter on February 17, 1984 explaining that a preliminary investigation had already been held and that the Plaintiff had been given a written confirmation of the results on the same day, February 10, 1984.

(21) The union contract requires that any request for a *formal* investigation be made within 5 days after written confirmation of the results of a preliminary investigation. The request by the Plaintiff was not a request for a formal investigation, which he never made. Moreover, even if the request for a preliminary investigation had been considered a request for a formal investigation, it was requested out of time.

(22) Pitman was not disciplined because Loflin's investigation showed he was not the aggressor. Pitman had been a Southern Railway employee for 12 years and had never been disciplined in contrast to Plaintiff's record of past discipline procedures.

(23) The Court, after carefully examining the evidence and judging the credibility of the witnesses, finds the evidence of the Defendant to be more credible than that of the Plaintiff and his first cousin Mungo. For instance, the Plaintiff testified that Ted Keightley was present when Pitman threatened the Plaintiff's life, and that Gary Ritchie was present all the time that Beck was there. Ted Keightley's testimony was that he saw the Plaintiff between 11:00 and 11:30 a.m., that Pitman was with him outside the cleaning pit, and that the Plaintiff said to Pitman: "I'll stomp your tail, you meet me in the parking lot." That was not the Plaintiff's testimony. Gary Ritchie testified that he was with the Plaintiff when Beck came out and asked the Plaintiff to clean the saw. He stated that the Plaintiff started hollering about washing the saw and that he (Plaintiff) didn't need anyone telling him what to do and for Beck to get out. Ritchie testified he had never heard anyone else talk like that. The Plaintiff's testimony conflicts with Ritchie's version of what happened.

Ritchie further testified that at noon time, he was within 20 feet of Plaintiff and Pitman, that Plaintiff was hollering to Pitman to go outside and fight, and that Pitman turned away. The Plaintiff's testimony was different.

(24) After his discharge the Plaintiff filed a charge of discrimination with the EEOC within 180 days. The EEOC, after investigating, found no reasonable cause to believe that discrimination had occurred and issued its "Right-to-Sue" letter. The Plaintiff instituted suit within 90 days after receipt of the letter.

### CONCLUSIONS OF LAW

The Court has jurisdiction over the Plaintiff's Title VII claim.

Title VII, 42 U.S.C. Section 2000e–2(a)(1) provides in pertinent part that:

It shall be an unlawful employment practice for an employer—

(1) ... to discharge any individual ... *because of such individual's race* (emphasis added).

What the Plaintiff has overlooked is that Title VII does not provide that a person may not be discharged *if* he is black, but *because* he is black.

Accordingly, under Title VII the burden remains on the Plaintiff to prove by a preponderance of the evidence that he was discriminated against (*i.e.*, discharged) *because* he was black, as a result of the facts of this case. *See, e.g., Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

■ The Plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine, supra; McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 793, 802, 93 S.Ct. 1817, 1820, 1824, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case, the Plaintiff must prove:

action taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'

*Furnco Construction Corp. v. Waters, supra;* see also *Texas Department of Community Affairs v. Burdine, supra;* and *McDonnell-Douglas Corp. v. Green, supra.*

■ Once the Plaintiff has proven a *prima facie* case of discrimination under Title VII the burden is then on the Defendant to articulate some legitimate, nondiscriminatory reason for the employee's dismissal. *Texas Department of Community Affairs v. Burdine, supra; Nashville Gas Co. v. Satty,* 434 U.S. 136, 143; 98 S.Ct. 347, 352, 54 L.Ed.2d 356 (1977); *McDonnell-Douglas Corp. v. Green, supra;* see also, 42 U.S.C. § 2000e–2(a). If the Defendant is able to show a nondiscriminatory reason for the dismissal, then the Plaintiff must prove by a preponderance of the evidence that the reason offered by the Defendant is merely a pretext and that discriminatory reasons more likely motivated the employer in its action toward the Plaintiff. *Texas Department of Community Affairs v. Burdine, supra; McDonnell-Douglas Corp. v. Green, supra.*

■ The Plaintiff contends that he was dismissed because of his race.

The Court disagrees. The Plaintiff's version of the events is not corroborated by the other witnesses' testimony, except for that of his first cousin, Mungo.

Even if Plaintiff's version of the initial encounter with Pitman is taken as true, it was the Plaintiff by his own testimony, and that of other witnesses, who reignited the argument with Pitman in Pitman's work area by telling Pitman that if he thought he could kill him (Plaintiff) to come on and do it. Further, when Superintendent Loflin came up and told the Plaintiff he was not going to have any argument or fighting on company property, and to leave the area, the Plaintiff told Loflin to leave, refused to

leave himself, and ate his lunch there. This insubordination by the Plaintiff coupled with the prior events and the Plaintiff's poor employment record was enough to justify the preliminary investigation and subsequent dismissal.

This Court will not require an employer to be subjected to insubordination by employees or disruption in the workplace by an employee because he is black or any other color. If employers cannot maintain some modicum of order and discipline in their place of business, they cannot survive.

The Court finds that the Plaintiff was discharged instead of Pitman *because* based on the Defendants' investigation it appeared that Plaintiff was the aggressor in his dispute with Pitman, because of his insubordination, and because of Plaintiff's poor work history with the Defendant, *not* because he is black. The law is clear that an employer's reason for his action may be a good reason, a bad reason, a mistaken reason, or no reason at all so long as the decision was not based on race or other unlawful discriminatory criteria. *Sanchez v. Texas Commission on Alcoholism,* 660 F.2d 658, 662 (5th Cir.1981); *Jefferies v. Harris County Community Affairs Association,* 615 F.2d 1025, 1036 (5th Cir.1980); *Silberhorn v. General Iron Works Co.,* 584 F.2d 970, 972 (10th Cir.1978); *Tims v. Board of Education,* 452 F.2d 551 (8th Cir.1971). An employer is not required to prove that its decision was correct; the trier of fact need only determine that the defendant, in good faith *believed* the plaintiff's performance to be unsatisfactory and that the asserted reason for the action was not a mere pretext for discrimination. *Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1323 n. 4 (11th Cir.1982).

The decision as to what criteria shall be considered in making an employment decision lies fully in the hands of the employer, as long as discriminatory criteria are not applied. *Bay v. Goodyear Tire & Rubber Co.,* 638 F.2d 1233 (5th Cir.1981), *cert. denied,* 454 U.S. 862, 102 S.Ct. 318, 70 L.Ed.2d 160 (1981).

The Plaintiff has not produced any evidence that white employees had engaged in conduct similar to that of the Plaintiff and were not punished.

The Plaintiff has been given as full and equal benefits of all laws and proceedings for his security as is enjoyed by white persons.

Since the Plaintiff has failed to prove that the Defendant's discharge of the Plaintiff was not because of his conduct, or that the Plaintiff was discharged *because* of his race, the Plaintiff is not entitled to relief and judgment should be entered for the Defendant.

Any finding of fact which is determined also to be a conclusion of law is so deemed, and any conclusion of law which is determined also to be a finding of fact is so deemed.

A judgment dismissing the action will be filed simultaneously with this Memorandum.